# In the United States Court of Appeals for the Fifth Circuit

STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY,

*Petitioners*,

*v.*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Respondents.*

On Petitions for Review of a Final Action
of the United States Environmental Protection Agency

## OPENING BRIEF FOR PETITIONERS

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

AARON L. NIELSON
Solicitor General

BILL DAVIS
Deputy Solicitor General

MICHAEL R. ABRAMS
Assistant Solicitor General
Michael.Abrams@oag.texas.gov

Counsel for the State of Texas and Texas Commission on Environmental Quality

# CERTIFICATE OF INTERESTED PERSONS

No. 23-60635

STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY,

*Petitioners*,

*v.*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Respondents.*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, petitioners, as governmental parties, need not furnish a certificate of interested persons.

/s/ Michael R. Abrams
MICHAEL R. ABRAMS
*Counsel of Record for the State of Texas and the Texas Commission on Environmental Quality*

i

## Statement Regarding Oral Argument

Texas respectfully requests oral argument. The United States Environmental Protection Agency (EPA) found that Texas failed to submit revisions to its state implementation plan (SIP) for three moderate nonattainment areas under the 2015 national ambient air quality standards (NAAQS) for ground-level ozone. That finding carries substantial collateral consequences, including the potential imposition of grave economic sanctions less than a year and a half from now.

Texas proactively tried to avoid this predicament. Before EPA published its finding, Texas asked for a voluntary reclassification of the three nonattainment areas from a "moderate" classification to a "serious" one. By statute, EPA has no discretion to deny Texas's request. The State expected—based on EPA's repeated and express representations in its rulemakings—that the request would obviate the need for EPA to address Texas's moderate area status and ascertain whether Texas's submissions at the moderate level were lacking. The challenged final rule reflects a stark turnabout from those prior assurances.

The resolution of this case implicates foundational administrative-law principles, including the change-in-position and good-faith-reliance doctrines, that this Court has expounded upon on multiple recent occasions (including as an en banc Court). This case also requires a careful understanding of intersecting provisions of the Clean Air Act. For these reasons, Texas submits that oral argument would aid the Court's decisional process.

# TABLE OF CONTENTS

Page(s)

Certificate of Interested Persons ............................................................ i

Statement Regarding Oral Argument ..................................................... ii

Table of Authorities .............................................................................. v

Glossary ............................................................................................... iix

Record References ................................................................................ iix

Statement of Jurisdiction ..................................................................... 1

Issues Presented ................................................................................... 1

Introduction ......................................................................................... 2

Statement of the Case .......................................................................... 4

    I.    Statutory Framework ................................................................. 4

        A.   The Clean Air Act's cooperative federalism ........................ 4

        B.   The administrator's revision of the ozone NAAQS and ensuing statutory rights and duties ................................................. 4

            1.   Area designations ........................................................ 5

            2.   Nonattainment classifications ...................................... 5

            3.   Reclassifications based on failure to attain ................... 6

            4.   Voluntary reclassifications ........................................... 6

        C.   States' SIP obligations .......................................................... 7

        D.   Federal sanctions for States' failure to submit complete SIPs ............ 8

    II.   Factual Background and Administrative History ......................... 9

        A.   EPA's revision of the ozone NAAQS ................................... 9

        B.   EPA's reclassification of three Texas areas as moderate nonattainment areas and imposition of SIP-submission schedules ..... 10

        C.   Texas's request for voluntary reclassification .................... 12

        D.   EPA's promulgation of the Final Rule and finding that Texas failed to submit complete SIP submissions for the three moderate areas .......... 13

    E.   EPA's proposal to approve the voluntary reclassification but to nevertheless require Texas to submit certain moderate-SIP elements ............................................................................. 14

Summary of the Argument ..................................................................... 15

Standard of Review ............................................................................... 16

Argument ............................................................................................... 17

    I.   EPA Departed From Its Prior Representations Without Explanation. ..... 17

    II.   EPA Wrongly Faulted Texas for Relying in Good Faith on EPA's Prior Position ........................................................................................... 20

Conclusion ............................................................................................. 23

Certificate of Service ............................................................................. 24

Certificate of Compliance ...................................................................... 24

# Table of Authorities

Page(s)

**Cases:**

*Alaska Prof'l Hunters Ass'n v. FAA,*
177 F.3d 1030 (D.C. Cir. 1999) ........................................................ 17

*Azar v. Allina Health Servs.,*
139 S. Ct. 1804 (2019) ................................................................... 20

*Bd. of Cnty. Comm'rs of Weld Cnty. v. EPA,*
72 F.4th 284 (D.C. Cir. 2023) ......................................................... 22

*Christopher v. SmithKline Beecham Corp.,*
567 U.S. 142 (2012) ....................................................................... 20

*DHS v. Regents of the University of California,*
140 S. Ct. 1891 (2020) ................................................................... 17

*Encino Motorcars, LLC v. Navarro,*
579 U.S. 211 (2016) ....................................................................... 21

*Env't Integrity Project v. EPA,*
425 F.3d 992 (D.C. Cir. 2005) ........................................................ 20

*Exxon Corp. v. Dept. of Energy,*
91 F.R.D. 26 (N.D. Tex. 1981) ........................................................ 19

*FCC v. Fox Television Stations, Inc.,*
556 U.S. 502 (2009) ................................................................. 17, 18

*FCC v. Prometheus Radio Project,*
592 U.S. 414 (2021) ................................................................. 16-17

*Luminant Generation Co. v. EPA,*
675 F.3d 917 (5th Cir. 2012) ........................................................ 4, 7

*Marsh v. Or. Nat. Res. Council,*
490 U.S. 360 (1989) ....................................................................... 17

*Nat'l Ass'n of Mfrs. v. Dep't of Defense,*
583 U.S. 109 (2018) ....................................................................... 22

*Ohio, et al. v. EPA,*
23A349 (S. Ct.) ................................................................................ 2

*Perez v. Mortg. Bankers Ass'n,*
575 U.S. 92 (2015) ......................................................................... 17

*Physicians for Soc. Resp. v. Wheeler,*
956 F.3d 634 (D.C. Cir. 2020) ...................................................... 3, 18

*R.J. Reynolds Vapor Co. v. Food & Drug Admin.*,
65 F.4th 182 (5th Cir. 2023) ........................................ 17, 20

*Smiley v. Citibank (S.D.), N.A.*,
517 U.S. 735 (1996) ....................................................... 17

*Sw. Airlines Co. v. FERC*,
926 F.3d 851 (D.C. Cir. 2019) ..................................... 3, 18

*Texas v. EPA*,
829 F.3d 405 (5th Cir. 2016) .............................................4

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*,
985 F.3d 472 (5th Cir. 2021) ...........................................17

*Universal Camera Corp. v. NLRB*,
340 U.S. 474 (1951) .......................................................19

*Wages & White Lion Invs. v. Food & Drug Admin.*,
16 F.4th 1130 (5th Cir. 2021) .........................................17

*Wages & White Lion Invs. v. Food & Drug Admin.*,
90 F.4th 357 (5th Cir. 2024) (en banc) ......................*passim*

**Statutes, Regulations, and Federal Register Materials:**

5 U.S.C.:
pt. I ................................................................................ix
§ 551(13) .......................................................................19
§ 706(2)(A) ....................................................................16
§ 706(2)(C) ....................................................................16

42 U.S.C.:
ch. 85 ..............................................................................ix
§ 7407(a) ..........................................................................7
§ 7407(d)(1)(A) .................................................................5
§ 7407(d)(1)(A)(i) ..............................................................5
§ 7407(d)(1)(A)(ii) .............................................................5
§ 7407(d)(1)(A)(iii) ............................................................5
§ 7407(d)(1)(B)(i) ...............................................................5
§ 7407(d)(1)(B)(ii) ..............................................................5
§ 7408 ...............................................................................4
§ 7409(a) ...........................................................................4
§ 7409(b)(1) .......................................................................4
§ 7409(b)(2) .......................................................................4
§ 7409(d)(1) .......................................................................5

§ 7410(a)(1) ...................................................... 7
§ 7410(a)(2) ...................................................... 7
§ 7410(a)(2)(H) ................................................. 7
§ 7410(c)(1) ...................................................... 9
§ 7410(k)(1)(B) ................................................. 8
§ 7471 .............................................................. 7
§ 7502(a)(2)(A) ................................................. 6
§ 7502(c)(1) ...................................................... 7
§ 7502(c)(3) ...................................................... 7
§ 7502(c)(5) ...................................................... 7
§ 7509(a) .......................................................... 8
§ 7509(b)(1) ................................................... 8, 9
§ 7509(b)(2) ...................................................... 8
§ 7511(a)(1) .............................................. 5, 6, 10
§ 7511(b)(2)(A) ................................................. 6
§ 7511(b)(2)(A)(i) ............................................. 6
§ 7511(b)(2)(A)(ii) ............................................ 6
§ 7511(b)(3) ...................................................... 7
§ 7511a(i) ............................................. 6, 7, 10, 19
§ 7511a(b)(1) .................................................... 8
§ 7511a(b)-(e) ................................................... 7
§ 7511a(c)(1) .................................................... 8
§ 7511a(d) ........................................................ 8
§ 7607(b)(1) ...................................................... 1
§ 7607(d)(9)(A) ................................................ 16
§ 7607(d)(9)(C) ................................................ 16

40 C.F.R.:
pt. 50 .............................................................. 5
§ 52.31 ............................................................ 8

80 Fed. Reg. 65,292 (Oct. 26, 2015) ................... 9
83 Fed. Reg. 10,376 (Mar. 9, 2018) ................. 5-6
83 Fed. Reg. 25,776 (June 4, 2018) ................... 9
83 Fed. Reg. 35,136 (July 25, 2018) ................ 10
87 Fed. Reg. 21,842 (Apr. 13, 2022) ................ 10
87 Fed. Reg. 60,897 (Oct. 7, 2022) ............. *passim*
88 Fed. Reg. 71,757 (Oct. 18, 2023) ........... *passim*
89 Fed. Reg. 5,145 (Jan. 26, 2024) ........ 14, 15, 22

**Other Authorities:**

Fact Sheet, Final Rule: Findings of Failure to Submit State
    Implementation Plan Revisions for Reclassified Moderate
    Nonattainment Areas for the 2015 Ozone National Ambient Air
    Quality Standards (NAAQS) ......................................................... 8-9
Order, *Texas v. EPA*, No. 23-60069 (5th Cir. May 1, 2023) ....................................2
TCEQ Comment Letter (June 13, 2022), Docket No. EPA–HQ–
    OAR–2021–0742 ............................................................................ 11

## Glossary

| | |
|---|---|
| Act | Clean Air Act, as codified in 42 U.S.C. ch. 85 |
| APA | Administrative Procedure Act, as codified in 5 U.S.C. pt. I |
| Doc. | CM/ECF document number in this case, No. 23-60635 |
| EPA | United States Environmental Protection Agency |
| Final Rule | "Findings of Failure To Submit State Implementation Plan Revisions for Reclassified Moderate Nonattainment Areas for the 2015 Ozone National Ambient Air Quality Standards (NAAQS)," 88 Fed. Reg. 71,757 (Oct. 18, 2023) |
| FIP | Federal Implementation Plan |
| NAAQS | National Ambient Air Quality Standard(s) |
| SIP | State Implementation Plan |
| TCEQ | Texas Commission on Environmental Quality |

## Record References

"C.I." refers to the certified index of record contents that EPA filed on January 24, 2024. *See* Fed. R. App. P. 17(b)(1)(B). Documents are identified by the final four digits (minus leading zeros) of the "Document ID" number. In accordance with Fifth Circuit Rule 30.2(a), Petitioners will file an appendix containing the portions of the record cited in the parties' briefs and in any amicus submissions. The appendix will be tabbed according to the citation format just described.

# Statement of Jurisdiction

On October 18, 2023, EPA published in the Federal Register its finding that Texas failed to timely submit a state implementation plan revision for three nonattainment areas classified as moderate for the 2015 ozone National Ambient Air Quality Standards, included as part of the final action entitled "Findings of Failure To Submit State Implementation Plan Revisions for Reclassified Moderate Nonattainment Areas for the 2015 Ozone National Ambient Air Quality Standards (NAAQS)," published at 88 Fed. Reg. 71,757 (Oct. 18, 2023). The State of Texas and TCEQ timely petitioned for review of the finding, Doc. 1-1, invoking this Court's jurisdiction under 42 U.S.C. § 7607(b)(1).

# Issues Presented

1.  Whether the Final Rule is arbitrary or capricious because EPA abandoned its past assurances without detailed justification.

2.  Whether the Final Rule is arbitrary or capricious because EPA improperly penalized Texas for its good faith reliance on the agency's past assurances.

The 2015 revisions to the air quality standards for ozone have led to litigation in this Circuit, *see, e.g.*, Order, *Texas v. EPA*, No. 23-60069 (5th Cir. May 1, 2023) (per curiam), and throughout the country, *see, e.g.*, *Ohio, et al. v. EPA*, 23A349 (S. Ct.) (oral argument held Feb. 21, 2024). Broadly speaking, the petitioners in those cases have asserted procedural irregularities in EPA's dealings with regulated entities. *E.g.*, Order, *Texas v. EPA*, No. 23-60069, at 18. This matter is no different.

In 2018, EPA designated three of the biggest metropolitan areas in Texas—Dallas–Fort Worth, Houston–Galveston–Brazoria, and San Antonio—as nonattainment areas and classified each as marginal nonattainment (the lowest rung of nonattainment classifications). Late in 2022, EPA determined that those areas failed to attain—in other words, failed to meet the standards—by the marginal attainment date. By statute, those areas were bumped up to a moderate classification, the next highest nonattainment level. Texas, in turn, was required to submit revisions to its state implementation plan, or SIP, to address the newly applicable requirements.

As EPA appreciates, SIP revisions are complex, time-consuming, and highly technical undertakings. EPA nonetheless gave Texas, among other affected States, less than three months from the date the reclassification was published in the Federal Register to finalize those revisions. That was an impossible ask, as commenters at the time (including TCEQ) repeatedly and emphatically warned. EPA did not relent. It instead told States that there was a workaround: request a voluntary reclassification to the next highest nonattainment level. Although that would mean even more

stringent planning criteria, it would also mean more time to complete the SIP revisions.

Texas took EPA at its word. It requested voluntary reclassification of its moderate nonattainment areas expecting that it would not be penalized for failing to meet EPA's unfairly compressed timeframe for moderate SIP revisions. Instead, EPA forged ahead, finding that Texas failed to submit required elements of its SIP revisions for the three areas. In that final rule, EPA did not mention the State's pending reclassification request or the agency's earlier suggestion that States seek voluntary reclassification.

Absent the Court's intervention, Texas will face all the consequences of voluntary reclassification without all the corresponding benefits that EPA promised. On the one hand, the State remains subject to a sanctions clock arising from the finding of a failure to submit and the potential that EPA will impose a costly federal implementation plan, or FIP, if it deems Texas's SIP inadequate. On the other, Texas will be subject to even more stringent planning requirements for the soon-to-be serious nonattainment areas. The APA proscribes that counterintuitive outcome. As courts have affirmed time and again, "[r]easoned decision-making requires that when departing from precedents or practices, an agency must 'offer a reason to distinguish them or explain its apparent rejection of their approach.'" *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 644 (D.C. Cir. 2020) (quoting *Sw. Airlines Co. v. FERC*, 926 F.3d 851, 856 (D.C. Cir. 2019)). Here, that principle compels the conclusion that EPA acted arbitrarily or capriciously when it penalized Texas without so much as mentioning why the agency's former representations carried no value.

For these reasons, and those discussed below, the finding of failure to submit should be set aside.

## Statement of the Case

## I. Statutory Framework

### A. The Clean Air Act's cooperative federalism

The Act is "an experiment in cooperative federalism" through which Congress "establishe[d] a comprehensive program for controlling and improving the nation's air quality through state and federal regulation." *Texas v. EPA*, 829 F.3d 405, 411 (5th Cir. 2016). Congress tasked EPA with setting NAAQS, but it ensured that States would play the primary role in implementing them. *Id.* "This division of responsibility between the states and the federal government 'reflects the balance of state and federal rights and responsibilities characteristic of our federal system of government.'" *Id.* (quoting *Luminant Generation Co. v. EPA*, 675 F.3d 917, 921 (5th Cir. 2012)). It "indicates a congressional preference that states, not EPA, drive the regulatory process." *Id.* This division of labor between EPA and the States, and its concordant respect for the States' role within the Act's regulatory framework, is reflected in the provisions discussed below, all of which are pertinent to Texas's petition for review.

### B. The administrator's revision of the ozone NAAQS and ensuing statutory rights and duties

The Act directs the EPA administrator to establish primary and secondary NAAQS for ozone at the level needed to protect public health and welfare. 42 U.S.C. § 7409(a); *id.* § 7408; *see id.* § 7409(b)(1), (2) (reflecting that primary standards

protect public health, while secondary standards protect public welfare). Every five years, the administrator must revise each NAAQS as appropriate. *Id.* § 7409(d)(1). New or revised NAAQS kick off a host of obligations for both EPA and the States.

### 1. Area designations

Within a year of the promulgation of a new or revised ozone NAAQS, the Governor of each State must "submit to the Administrator a list of all areas (or portions thereof) in the State" designated as either nonattainment, attainment, or unclassifiable. *Id.* § 7407(d)(1)(A). A "nonattainment" area is one that "does not meet (or . . . contributes to ambient air quality in a nearby area that does not meet) the [NAAQS]." *Id.* § 7407(d)(1)(A)(i). An "attainment" area is "any area (other than [a nonattainment area]) that meets the [NAAQS]." *Id.* § 7407(d)(1)(A)(ii). An "unclassifiable" area is "any area that cannot be classified on the basis of available information as meeting or not meeting the [NAAQS]." *Id.* § 7407(d)(1)(A)(iii). The administrator then finalizes area designations for a NAAQS by either promulgating a governor's designations or making modifications to those designations, which the Act allows in limited circumstances. *Id.* § 7407(d)(1)(B)(i), (ii).

### 2. Nonattainment classifications

When an area is designated as nonattainment for ozone, the administrator must classify the area based on its degree of nonattainment. "Each area designated nonattainment for ozone" shall be classified as marginal, moderate, serious, severe, or extreme based on its "design value." *Id.* § 7511(a)(1); *see* 40 C.F.R. pt. 50, App'x U (reflecting how EPA calculates ozone design values); Implementation of the c 83

Fed. Reg. 10,376 (Mar. 9, 2018) (establishing the air-quality thresholds that define the classifications assigned to all nonattainment areas for the 2015 ozone NAAQS).

### 3. Reclassifications based on failure to attain

States must meet deadlines, or "attainment dates," by which nonattainment areas need to reach attainment status. 42 U.S.C. § 7502(a)(2)(A). An area classified as a marginal ozone nonattainment area—the least stringent nonattainment level—has three years from the date of initial designation as nonattainment to reach attainment status, *id*. § 7511(a)(1); an area designated moderate—the next level—has six years to reach attainment status, *id*.; and so on, *id*. At the conclusion of the applicable period, the administrator recalculates the area's design value to determine "whether the area attained the standard by [the attainment] date." *Id.* § 7511(b)(2)(A). If an area fails to attain the NAAQS by its deadline, *see id*. § 7511(a)(1), the administrator must reclassify the area to "the higher of . . . the next higher classification" or "the classification applicable to the area's design value," *id*. § 7511(b)(2)(A)(i), (ii).

Reclassifications also require new SIP revision and attainment deadlines. In that regard, the Act requires reclassified areas to meet the applicable classification's requirements "according to the schedules prescribed in connection with such requirements, except that the Administrator may adjust any applicable deadlines (other than attainment dates) to the extent such adjustment is necessary or appropriate to assure consistency among the required submissions." *Id.* § 7511a(i).

### 4. Voluntary reclassifications

If a State concludes that it needs more time to attain the NAAQS, it can seek voluntary reclassification. The Act provides that a State may request, at any time, to

reclassify a nonattainment area in that State to a higher classification. *Id.* § 7511(b)(3). The administrator "shall" grant any such request and is required to "publish a notice in the Federal Register of any such request and of action by the Administrator granting the request." *Id.*

## C. States' SIP obligations

To implement the NAAQS, "states must adopt and administer [SIPs]," *Luminant*, 675 F.3d at 921, which "provide[] for implementation, maintenance, and enforcement" of the NAAQS within their borders, 42 U.S.C. § 7410(a)(1). After the administrator establishes or revises a NAAQS, States have three years (or such shorter period as EPA prescribes) to submit SIPs or SIP revisions specifying how the NAAQS will be met and including numerous congressionally mandated SIP components. *Id.* § 7407(a); *id.* § 7410(a)(1), (a)(2), (a)(2)(H).

For attainment or unclassifiable areas, States need only meet the Act's general SIP requirements and implement standard emission-control measures, such as preventing significant deterioration of air quality. *See id.* §§ 7410(a)(2), 7471. For nonattainment areas, the Act imposes more onerous requirements, including that States establish more stringent permitting programs for pollution sources, *see id.* § 7502(c)(5), submit "comprehensive, accurate, current inventor[ies] of actual emissions from all sources," *id.* § 7502(c)(3), and demonstrate that they intend to implement "all reasonably available control measures" and "reasonably available control technology," *id.* § 7502(c)(1).

The Act requires additional, and more burdensome, planning steps at each ozone nonattainment classification level. *See id.* § 7511a(b)-(e). States with moderate

nonattainment areas, for example, must satisfy all the requirements for marginal areas plus several others, such as planning for significant annual reductions in emissions of volatile organic compounds and nitrogen oxides. *Id.* § 7511a(b)(1). To use another illustration, States with serious nonattainment areas must satisfy all moderate area requirements and several others, including enhanced monitoring of ozone, oxides of nitrogen, and volatile organic compounds. *Id.* § 7511a(c)(1); *see also, e.g.*, *id.* § 7511a(d) (setting out planning requirements for severe nonattainment areas).

### D. Federal sanctions for States' failure to submit complete SIPs

Within six months of a State's deadline to submit a SIP, the administrator must determine whether the State's submission meets the minimum completeness criteria established by the Act. *Id.* § 7410(k)(1)(B). If the administrator finds that "a State has failed, for an area designated nonattainment[,] . . . to submit a plan, or to submit 1 or more of the elements (as determined by the Administrator)" required by the Act for such an area, the administrator must impose sanctions on the State "unless such deficiency has been corrected within 18 months after the finding." *Id.* § 7509(a).

There are two types of sanctions for a failure to submit: highway sanctions and offsets. *Id.* § 7509(b)(1), (2). In this circumstance, offset sanctions require the State to ensure that volatile organic compound or nitrogen oxides emissions from a new or modified major source in the area are "offset" by emission reductions from other sources in the area at a ratio of at least 2 to 1. *See* 40 C.F.R. § 52.31; *see also* Fact Sheet, Final Rule: Findings of Failure to Submit State Implementation Plan Revisions for Reclassified Moderate Nonattainment Areas for the 2015 Ozone National

Ambient Air Quality Standards (NAAQS), *available at* https://www.epa.gov/system/files/documents/2023-10/fact-sheet-2015-o3-mod-ffs.pdf.

If highway sanctions take effect, they compel the Federal Highway Administration to impose a funding moratorium on projects, with the exceptions of mass transit projects or projects for safety. 42 U.S.C. § 7509(b)(1). Beyond the threat of sanctions, a finding of failure to submit establishes a two-year window for EPA to either approve a State's SIP revisions or issue a federal implementation plan, commonly known as a FIP, addressing emissions-control requirements for the affected areas. *Id.* § 7410(c)(1).

## II. Factual Background and Administrative History

### A. EPA's revision of the ozone NAAQS

In October 2015, the administrator revised the ozone NAAQS. National Ambient Air Quality Standards for Ozone, 80 Fed. Reg. 65,292 (Oct. 26, 2015) (promulgated Oct. 1, 2015). That action replaced the preexisting ozone NAAQS of 0.075 parts per million (ppm) with a more stringent 0.070 ppm. *Id.* at 65,293-94.

In consultation with the States, the administrator then designated hundreds of areas across the country for the 2015 ozone NAAQS. Only three areas are relevant here. In 2018, the administrator designated three Texas areas of substantial size and economic significance—Dallas–Fort Worth, Houston–Galveston–Brazoria, and San Antonio—as marginal nonattainment areas. Additional Air Quality Designations for the 2015 Ozone National Ambient Air Quality Standards, 83 Fed. Reg. 25,776, 25,830 (June 4, 2018); Additional Air Quality Designations for the 2015 Ozone

National Ambient Air Quality Standards—San Antonio, Texas Area, 83 Fed. Reg. 35,136, 35,136 (July 25, 2018). Once the administrator promulgated those designations, the attainment date for the Dallas–Fort Worth and Houston–Galveston–Brazoria areas was set for August 3, 2021, and the attainment date for the San Antonio area was set for September 24, 2021. *See* 42 U.S.C. § 7511(a)(1).

## B. EPA's reclassification of three Texas areas as moderate nonattainment areas and imposition of SIP-submission schedules

In April 2022, EPA proposed to find that the three Texas areas failed to attain the standards by their applicable attainment dates. *See* Determinations of Attainment by the Attainment Date, Extensions of the Attainment Date, and Reclassification of Areas Classified as Marginal for the 2015 Ozone National Ambient Air Quality Standards, 87 Fed. Reg. 21,842, 21,844 (Apr. 13, 2022). EPA then delayed nearly seven months before finalizing the rule. *See* C.I. 4, Determinations of Attainment by the Attainment Date, Extensions of the Attainment Date, and Reclassification of Areas Classified as Marginal for the 2015 Ozone National Ambient Air Quality Standards, 87 Fed. Reg. 60,897, 60,897 (Oct. 7, 2022).

In that rule, EPA found that the three Texas areas failed to attain by the attainment date. *Id.* at 60,901. The "effect of failing to attain by the applicable attainment date is that these areas" were to be "reclassified by operation of law to 'Moderate' nonattainment for the 2015 ozone NAAQS on November 7, 2022." *Id.* at 60,897.

That reclassification, and the attendant delay in finalizing it, raised an important question: what would be the States' new deadline for providing EPA with moderate SIP submissions? Citing 42 U.S.C. § 7511a(i) and invoking the "combination of

10

constraints dictated by the statutory and regulatory requirements for reclassified ozone areas, particularly at the lower classifications," EPA imposed a deadline of January 1, 2023. C.I. 4, 87 Fed. Reg. at 60,908.

In setting that deadline, EPA acknowledged that the agency missed its own deadline—the "statutory due date" for the reclassification action—by more than eight months. *Id.* at 60,908 (noting the February 3, 2022, statutory deadline). And EPA was candid that the January 1 deadline would be "challenging" for many States to meet. *Id.* EPA did not quibble with the commenters who called out the "short planning timeframe available to states with newly reclassified Moderate areas" and conceded that "delays in this rulemaking have reduced the time between the effective date of final area reclassifications and the proposed January 1, 2023, deadlines for SIP submissions for these areas." *Id.* at 60,907; *see also* TCEQ Comment Letter (June 13, 2022), Docket No. EPA–HQ–OAR–2021–0742, *available at* https://www.regulations.gov/comment/EPA-HQ-OAR-2021-0742-0231 ("It is impracticable, if not impossible, for affected sources to comply with the new rule on the EPA's proposed timeline.").

EPA was unmoved. No less than seven times throughout the final rule, it justified its harsh approach by noting a statutory safe-valve available to affected States: voluntary reclassification. EPA emphasized that "a state may at any time request—and the EPA must grant—a voluntary reclassification." C.I. 4, 87 Fed. Reg. at 60,907. That mattered, according to EPA, because voluntary reclassification is one way that "states can anticipate and manage the tight timeframes to develop required SIP revisions for reclassified nonattainment areas." *Id.* As EPA explained, a

voluntary reclassification "resets the area's attainment date into the future, and would therefore likely provide more time and flexibility for developing and submitting required SIP revisions." *Id.* at 60,909. States would be "fully within their rights to recognize" that an area may not attain by the attainment date and to take steps to "put themselves in a better position for longer planning and implementation timeframes." *Id.* at 60,910.

### C.   Texas's request for voluntary reclassification

EPA's action left Texas in a bind. Faced with the possibility of sanctions, on the one hand, and voluntary reclassification (and its attendant burdens) on the other, the State chose the latter. In a letter to the administrator, Governor Abbott exercised his authority under the Act "to request voluntary reclassification of the Bexar County, Dallas-Fort Worth, and Houston-Galveston Brazoria 2015 ozone standard nonattainment areas from moderate to serious." C.I. 22, Voluntary Reclassification of Texas 2015 Ozone Standard Moderate Nonattainment Areas (Oct. 12, 2023).

His letter observed that "EPA has left Texas no choice but to request voluntary reclassification of these areas by establishing absurd [SIP] submittal deadlines, changing the accepted approaches for how to meet [Act] requirements while SIP development is in progress, and failing to provide states with timely guidance on how to meet these moving goalposts, all of which demonstrates disrespect for limited state resources." *Id.* In line with TCEQ's earlier objections, Governor Abbott expressed that "EPA knowingly set states up to fail by establishing a deadline that was impossible to meet" and elaborated that "EPA's compressed timeline did not provide a reasonable amount of time for Texas to develop new attainment plans,

evaluate controls, conduct rulemaking, and give affected businesses sufficient time to implement control requirements that could demonstrate attainment by December 2023." *Id.* Based on the "risk of potential sanctions and federal implementation plans that could have lasting detrimental impacts to industry in [Texas]," Governor Abbott "request[ed] voluntary reclassification of these nonattainment areas to protect the Texas economy." *Id.*

### D. EPA's promulgation of the Final Rule and finding that Texas failed to submit complete SIP submissions for the three moderate areas

Just six days later, and without mention of Texas's request for reclassification, EPA published a final action in the Federal Register to find that Texas, along with ten other States, "failed to submit specific required SIP elements, which were due no later than January 1, 2023." C.I. 1, Findings of Failure To Submit State Implementation Plan Revisions for Reclassified Moderate Nonattainment Areas for the 2015 Ozone National Ambient Air Quality Standards (NAAQS), 88 Fed. Reg. 71,757, 71,758 (October 18, 2023); *see id.* at 71,759 (indicating that the three Texas areas each failed to submit eight required SIP elements). In the Final Rule, EPA indicated that it would apply offset sanctions if the agency "has not affirmatively determined that [Texas] has made the required complete SIP submittal for an area within 18 months of the effective date of this action." *Id.* at 71,759. And if EPA "has not affirmatively determined that the State has made the required complete SIP submittal within 6 months after the offset sanction is imposed, then the highway funding sanction will apply in the affected nonattainment area." *Id.* The sanctions "will not take effect if, within 18 months after the effective date of these findings, the EPA

affirmatively determines that the State has made a complete SIP submittal addressing the deficiency for which the finding was made." *Id.* As EPA recognized, this action triggered an independent obligation for EPA to "promulgate a FIP no later than 2 years after issuance of the finding of failure to submit if the affected State has not submitted, and the EPA has not approved, the required SIP submittal." *Id.*

### E. EPA's proposal to approve the voluntary reclassification but to nevertheless require Texas to submit certain moderate-SIP elements

On January 26, 2024, EPA published a proposed rule addressing Texas's request for reclassification. *See* "Clean Air Act Reclassification of the San Antonio, Dallas-Fort Worth, and Houston-Galveston Brazoria Ozone Nonattainment Areas; TX," 89 Fed. Reg. 5,145 (Jan. 26, 2024). EPA "reads the relevant statutory language to provide no discretion to deny the request made in this instance." *Id.* at 5,146. In addressing how the reclassification would affect the October 2023 finding, EPA proposed to interpret the Act as providing that "when an ozone nonattainment area is reclassified, the attainment date for the prior classification is superseded by the attainment date for the new classification." *Id.* at 5,147. Thus, "once a nonattainment area has been reclassified and as a result has a new statutory attainment deadline, certain SIP elements. . .which are tied to the applicable attainment deadline are no longer required for the lower, superseded classification." *Id.* EPA went so far as to say that requiring "a state to submit or EPA to act on such SIP elements would make no logical or practical sense." *Id.*

EPA therefore proposed "to determine that the October 2023 findings that EPA published with respect to SIP revisions" for three specified SIP elements "are now moot, and that the associated deadlines triggered by the October 2023 findings for imposition of sanctions or promulgation of a FIP no longer apply with respect to these three identified elements." *Id.*

But EPA posited that "there remain several Moderate area SIP requirements that continue to be required after these areas are reclassified to Serious." *Id.* As to those elements, they are supposedly "unaffected because their meaning is not dependent upon the attainment date itself." *Id.* Texas has timely submitted comments objecting to EPA's proposal to hold Texas to moderate SIP requirements and the sanctions the State will face if the requirements are not satisfied. That rulemaking has not been finalized.

## Summary of the Argument

The Court should hold unlawful and set aside EPA's finding of failure to submit because it violates two longstanding administrative-law precepts.

*First*, the Final Rule violates the change-in-position doctrine. *See Wages & White Lion Invs. v. Food & Drug Admin.*, 90 F.4th 357, 381 (5th Cir. 2024) (en banc) (describing the doctrine). EPA represented that voluntary reclassification would allow Texas greater flexibility to meet what would otherwise be unachievable SIP-submission deadlines. And EPA never caveated that this flexibility was limited to only a subset of the applicable requirements. Texas relied on those representations, but EPA reversed course without so much as a mention of them. The change-in-position

doctrine forbids such abrupt departures without "detailed justification." *Id.* The Final Rule lacks any justification for EPA's change in position, let alone a detailed one.

*Second*, even if an agency lawfully changes position, "it cannot fault a party for relying in good faith on the prior one." *Id.* at 384. Agencies must consider the reliance interests that those former positions have engendered. And here, the reliance interests are of enormous import. Voluntary reclassification is no minor decision. By requesting reclassification, a State subjects itself and regulated entities to stricter obligations and federal oversight. Texas would never have pressed ahead with reclassification (which it knew the administrator had no discretion to deny) absent the well-founded belief that the reclassification would stave off an otherwise imminent sanctions clock. Administrative law "prohibits administrative agencies from saying one thing, pulling a surprise switcheroo, and ignoring the reasonable reliance interests engendered by its previous statements." *Id.* at 386. Because that is what EPA has done here, the Final Rule violates the good-faith-reliance doctrine and should be set aside.

## Standard of Review

The APA empowers this Court to "hold unlawful and set aside" certain "agency action"—including, as relevant here, a "finding[]" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C); *accord* 42 U.S.C. § 7607(d)(9)(A), (C). "The APA's arbitrary-and-capricious standard"—the key standard at issue in this matter—"requires that agency action be reasonable and reasonably explained." *FCC v.*

*Prometheus Radio Project*, 592 U.S. 414, 423 (2021). "Put simply, [the Court] must set aside any action premised on reasoning that fails to account for 'relevant factors' or evinces a 'clear error of judgment.'" *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)). This review is "not toothless." *Wages & White Lion Invs. v. Food & Drug Admin.*, 16 F.4th 1130, 1136 (5th Cir. 2021). Indeed, "after [*DHS v. Regents of the University of California*, 140 S. Ct. 1891 (2020)], it has serious bite." *Id.*

## ARGUMENT

## I. EPA Departed From Its Prior Representations Without Explanation.

**A.** "Dealing with administrative agencies is all too often a complicated and expensive game, and players like [Texas] are 'entitled to know the rules.'" *R.J. Reynolds Vapor Co. v. Food & Drug Admin.*, 65 F.4th 182, 189 (5th Cir. 2023) (quoting *Alaska Prof'l Hunters Ass'n v. FAA*, 177 F.3d 1030, 1035 (D.C. Cir. 1999), *abrogated on other grounds by Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92 (2015)). Thus, when an agency reverses "prior policy," it must provide a "detailed justification" for doing so, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009), and "must take into account 'serious reliance interests' its 'longstanding policies may have engendered' along with 'alternatives that are within the ambit of the existing policy,'" *R.J. Reynolds*, 65 F.4th at 189 (quoting *Regents*, 140 S. Ct. at 1913). "Sudden and unexplained change, or change that does not take account of legitimate reliance on prior interpretation, may be arbitrary, capricious, or an abuse of discretion." *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 742 (1996) (cleaned up). But regardless of how "the

agency justifies its new position, what it may not do is 'gloss[] over or swerve[] from prior precedents without discussion.'" *Physicians for Soc. Resp.*, 956 F.3d at 645 (quoting *Sw. Airlines*, 926 F.3d at 856).

**B.** EPA's disapproval violates these commonsense bounds on agency behavior. To start, the agency did not "display awareness that it *is* changing position." *FCC*, 556 U.S. at 515. But EPA undoubtedly took a firm position in the previous rulemaking. *Wages & White Lion Invs.*, 90 F.4th at 381. In the final rule reclassifying areas for the 2015 ozone NAAQS, EPA described voluntary reclassification as a way "to anticipate and manage the tight timeframes for SIP development and submission." C.I. 4, 87 Fed. Reg. at 60,907. That sentiment is woven into multiple responses to comments. *E.g.*, *id.* (stating that "there are proactive and voluntary pathways by which states can anticipate and manage the tight timeframes to develop required SIP revisions for reclassified nonattainment areas"); *id.* at 60,909 (noting the "voluntary pathways by which states can anticipate and manage the tight timeframes to develop required SIP revisions for reclassified nonattainment areas, including early planning and voluntary reclassification."); *id.* (providing the assurance that "voluntary reclassification provides another way for states to anticipate and manage the tight timeframes for SIP development for nonattainment areas"). And EPA made clear that this weighty decision falls on the States, not EPA: "The EPA cannot, under the [Act], reclassify areas that it knows will not attain or are unlikely to attain by the attainment date; but states are fully within their rights to recognize this and put themselves in a better position for longer planning and implementation timeframes." *Id.* at 60,910.

EPA's repeated invocation of voluntary reclassification was no throwaway. It served a crucial purpose: providing a shield against an arbitrary-or-capricious challenge to what even EPA admitted was a tight SIP submission schedule. Although EPA generally has discretion to set that schedule following a reclassification, *see* 42 U.S.C. § 7511a(i), EPA's exercise of discretion still must comport with the APA, *see* 5 U.S.C. § 551(13) (defining agency action). By telling States that they could plan around the three-month SIP-submission deadline, EPA tried to show regulated parties (and the federal courts, if a dispute reached that forum), that its action was not arbitrary or capricious.

For those reasons, when EPA issued the finding of failure to submit, the agency needed to fulsomely address those pledges. *See Wages & White Lion Invs.*, 90 F.4th at 381. By that point, Governor Abbott's request for reclassification was before EPA; its inclusion in the administrative record confirms that the relevant decisionmakers considered it (or at least should have considered it) before finalizing the challenged action. *See Exxon Corp. v. Dept. of Energy*, 91 F.R.D. 26, 33 (N.D. Tex. 1981) (Higginbotham, J.) (mem. op.) (the administrative record comprises "all documents and materials directly or indirectly considered by agency decision-makers and includes evidence contrary to the agency's position" (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–88 (1951)). At a minimum, EPA was obligated to explain why the voluntary reclassification would *not* be a means for Texas to "manage the tight timeframes for SIP development for nonattainment areas." C.I. 4, 87 Fed. Reg. at 60,909.

EPA did not do so, and that failure is fatal to the Final Rule's validity. "An agency cannot shift its understanding of the law between those two times, deny or downplay the shift, and escape vacatur under the APA." *Wages & White Lion Invs.*, 90 F.4th at 381. In the five-page Final Rule, EPA cited the October 2022 final rule just twice—and only for the propositions that "the EPA determined that 22 areas or portions of areas classified as Marginal under the 2015 ozone NAAQS failed to attain the standards by the applicable attainment date and were reclassified as Moderate, effective November 7, 2022," and that "SIP revisions for the nonattainment areas reclassified as Moderate, effective November 7, 2022, were due no later than January 1, 2023." C.I. 1, 88 Fed. Reg. at 71,758. The change-in-position doctrine requires far more. *Wages & White Lion Invs.*, 90 F.4th at 381. On this basis alone, the Final Rule should be set aside.

## II. EPA Wrongly Faulted Texas for Relying in Good Faith on EPA's Prior Position.

**A.** The Final Rule also violates the good-faith-reliance doctrine. As its title suggests, this doctrine is about fairness. "[A]gencies must give notice of conduct the agency 'prohibits or requires' and cannot 'surprise' a party by penalizing it for 'good-faith reliance' on the agency's prior positions." *R.J. Reynolds*, 65 F.4th at 189 (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156-57 (2012)). Courts "refuse[] to allow agencies to use the rulemaking process to pull a surprise switcheroo on regulated entities." *Env't Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005); *accord Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1810 (2019) (acknowledging the "surprise switcheroo" doctrine); *R.J. Reynolds*, 65 F.4th at 189

n.6 (same). Thus, "even when an agency lawfully changes its position, it cannot fault a party for relying in good faith on the prior one." *Wages & White Lion Invs.*, 90 F.4th at 384.

**B.** EPA's prior assurances produced the kind of "serious reliance interests that must be taken into account." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (quotation marks omitted). When Governor Abbott requested voluntary reclassification of the three moderate nonattainment areas, Texas "could [have] reasonably underst[ood] that its actions" would spare it a finding of failure to submit. *Wages & White Lion Invs.*, 90 F.4th at 385. The primary reason a State would want a longer runway for attainment planning, *see* C.I. 4, 87 Fed. Reg. at 60,907, is the avoidance of penalties for not meeting the shorter one. EPA "could not ignore that reasonable reliance [and] reach a contrary result." *Wages & White Lion Invs.*, 90 F.4th at 385.

Or put another way, the October 2022 final rule reclassifying the three moderate areas "certainly could be read in good faith the way" Texas reads it. *Id.* Governor Abbott's request to EPA highlighted the "risk of potential sanctions and federal implementation plans that could have lasting detrimental impacts to industry." C.I. 22. Texas saw this request as essential "to protect the Texas economy." *Id.* EPA cannot show that this understanding was unreasonable. *See Wages & White Lion Invs.*, 90 F.4th at 385; *supra* Part I.B (setting out EPA's heavy emphasis on the States' option to request voluntary reclassification). For these reasons, even if the agency had properly explained why the request for voluntary reclassification did not entirely

moot out the need to evaluate Texas's moderate SIP revisions (which EPA did not), the Final Rule would still flunk APA review.

**C.** The Final Rule "remains on the books for now" and "the parties retain 'a concrete interest' in the outcome of this litigation." *Nat'l Ass'n of Mfrs. v. Dep't of Defense*, 583 U.S. 109, 120 n.5 (2018). It is no answer that EPA has proposed a final rule to grant the Governor's request for voluntary reclassification and eliminate *some*, but not all, of the "associated deadlines triggered by the October 2023 findings for imposition of sanctions." 89 Fed. Reg. at 5,147. Even if that proposed rule takes effect exactly as drafted, the threat of sanctions will remain on the table because EPA will have refused to fully moot out its failure-to-submit finding. *See id.* In other words, the Final Rule "created substantial legal exposure" for Texas, *Bd. of Cnty. Comm'rs of Weld Cnty. v. EPA*, 72 F.4th 284, 295 (D.C. Cir. 2023), and the proposed rule would not eliminate that risk; instead, it would maintain it. In that manner, the proposed rule amplifies the threshold problem with the Final Rule: there never should have been a finding of failure to submit once Texas requested reclassification. *See supra* Parts I.B, II.B. A proposed rule that reinforces that finding (and which still fails to address EPA's representations and Texas's reasonable reliance interests) only heightens the need for relief.

## Conclusion

The Court should grant Texas's petition for review and set aside the Final Rule's finding that Texas failed to submit a SIP revision for three nonattainment areas classified as moderate for the 2015 ozone NAAQS.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Aaron L. Nielson
Solicitor General

Bill Davis
Deputy Solicitor General

/s/ Michael R. Abrams
Michael R. Abrams
Assistant Solicitor General
Michael.Abrams@oag.texas.gov

Counsel for the State of Texas and Texas Commission on Environmental Quality

## Certificate of Service

On March 5, 2024, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Michael R. Abrams

Michael R. Abrams

## Certificate of Compliance

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 5,742 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Michael R. Abrams

Michael R. Abrams